**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Bradley Nims, a special agent with the United States Department of Homeland

Security, Immigration and Customs Enforcement, Homeland Security Investigations (HSI),

being duly sworn, do depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a special agent with the U.S. Department of Homeland Security,

Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), and

have been so employed since April 2018. I am currently assigned to the Manchester, New

Hampshire field office. As part of my regular duties as a special agent, I investigate criminal

violations relating to a broad range of immigration and customs-related statutes and have been

cross-designated to investigate violations relating to the distribution of illicit narcotics as

specified under Title 21 of the U.S. Code. I have been trained in drug investigations, search

warrants, surveillance, debriefing of informants, and other investigative procedures. Through my

training, education, and experience, I have become familiar generally with the manner in which

drug distribution organizations conduct their illegal activities, including purchasing,

manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the

efforts of persons involved in such activity to avoid detection by law enforcement. In addition, I

have become generally familiar with the manner in which dug distribution organizations keep

records of narcotics and monetary transactions, including through drug customer lists and other

documents relating to the manufacturing, transportation, ordering, purchasing and distribution of

controlled substances, as well as the collection, expenditure, accounting, transportation, and

laundering of drug proceeds. In the course of participating in investigations of drug distribution organizations, I have conducted or participated in surveillance, the purchase of illegal drugs, the execution of search warrants, the use of tracking devices, debriefings of subjects, witnesses, and informants, and reviews of consensually recorded conversations and meetings.

2.      Through my training, education, and experience, I have gained an understanding of criminal drug distribution activity. I have become generally familiar with the way that drug distribution organizations conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activities to avoid detection by law enforcement. I am familiar with the various methods of operation employed by narcotics traffickers to further their illicit operations, including methods used by them to distribute, store, and transport narcotics, as well as methods used by them to collect, expend, account for, transport, and launder drug proceeds. I am also familiar with the way that narcotics traffickers use personal and rented cars and trucks, common carriers, mail and private delivery services, and a variety of other motor vehicles to: (a) meet with co-conspirators, customers, and suppliers; (b) transport, distribute, and purchase narcotics; (c) transport funds used to purchase narcotics; and (d) transport the proceeds of narcotics transactions. I have also learned that narcotics trafficking typically involves the local, interstate, and international movement of illegal drugs, to distributors and co-conspirators at multiple levels, and the movement of the proceeds of narcotics trafficking among multiple participants including suppliers, customers, distributors, and money launderers.

3.      I have consulted various sources of information to support my statements in this Affidavit. These statements are based on my participation in this investigation, as well as

2

information I consider reliable from the following sources: my experience investigating drug trafficking offenses; oral and written reports and documents about this investigation that I have received from members of other federal and local law enforcement agencies; discussions I have had personally concerning this investigation with other experienced narcotics investigators; physical surveillance conducted by law enforcement agents assisting this investigation, the results of which have been reported to me either directly or indirectly; and public records and law enforcement databases, among other sources.

4.      This Affidavit distinguishes between my direct and indirect knowledge of the matters asserted. Unless otherwise indicated, the statements contained herein are summaries of information that I have received from other law enforcement agents, and I specifically relied on oral reports and opinions from other law enforcement agents. When information is based on my personal knowledge or conclusion, it will be so stated.

5.      Since this affidavit is being submitted for the limited purpose of establishing probable cause to support the issuance of a search warrant, I have not included details about every aspect of the investigation. Observations made and conclusions drawn throughout this affidavit are based on my training and experience and include the training and experience of other law enforcement with whom I have discussed this case. While this affidavit contains material information pertinent to the requested search warrant, it does not set forth all of my knowledge about this matter.

## PURPOSE OF AFFIDAVIT

6.      I make this affidavit in support of an application for a search warrant to search the following locations:

3

a.   A shed/garage located at 422 Lake Avenue, Manchester, New Hampshire ("422 LAKE AVENUE SUBJECT PREMISES"), as more particularly described in **ATTACHMENT A-1**;

b.   A garage located at 33 Dutton Street, Manchester, New Hampshire "(33 DUTTON STREET SUBJECT PREMISES"), as more particularly described in **ATTACHMENT A-2**; and

c.   The electronic devices, including mobile phones, computers, and tablets, belonging to and/or primarily used by Walter VELEZ, via forensic search and examination of content created and/or stored, from April 10, 2023, through the present, as well as other evidence, fruits, or instrumentalities of drug dealing as further described in **ATTACHMENT B**.

7.   Based on my training and experience, I submit that the fact contained in this Affidavit establish probable cause to believe that VELEZ, and others yet unknown to the Government, had committed violations of Title 21, United States Code, Sections 841(a)(1), Distribution of a Controlled Substance, and that evidence, fruits, and instrumentalities, of this offense, as well as evidence of the identity of co-conspirators will be found in the 422 LAKE AVENUE SUBJECT PREMISES, the 33 DUTTON STREET SUBJECT PREMISES, and within VELEZ's electronic devices.

## **PROBABLE CAUSE**

8.   I am currently involved in an investigation concerning violations of 21 U.S.C. 841(a)(1), Distribution of a Controlled Substance.  This investigation arose from four controlled purchases of fentanyl and/or crack cocaine from VELEZ in April 2023.  Each purchase occurred at 416 Lake Avenue, Manchester, New Hampshire ("416 Lake Avenue").

9.      In connection with this investigation, on July 20, 2023, I obtained federal search warrant #23-mj-140-01-AJ for the premises at 416 Lake Avenue and the person of VELEZ, as well as a complaint and arrest warrant #23-mj-139-01-AJ charging VELEZ under 21 U.S.C. 841(a)(1), Distribution of a Controlled Substance.  Attached hereto as **ATTACHMENT C** is a true and accurate copy of my supporting search warrant affidavit in #23-mj-140-01-AJ, which details relevant information obtained during the investigation. My supporting affidavit is further incorporated herein by reference for all intents and purposes.

10.      On July 21, 2023, at 6:00 a.m., HSI special agents executed search warrant #23-mj-140-01-AJ at the 416 Lake Avenue premises.  Simultaneously, the execution of federal arrest warrant #23-mj-139-01-AJ was attempted for VELEZ. Upon clearing 416 Lake Avenue, VELEZ was not located. During the clearing process, a neighbor living next door to the 416 Lake Avenue premises, who resides at 422 Lake Avenue, frantically waived down law enforcement members who were providing perimeter security. The neighbor was standing at the main entrance to the multi-family residence at 422 Lake Avenue with the door halfway open. She was advised to close the door and remain inside. The neighbor complied but continued to frantically waive down law enforcement through the door window with her hand motioning for us to come speak with her.

11.      For safety reasons, law enforcement did not initially comply with her request. She again opened the front door, continuing to signal for law enforcement to come over to her. The neighbor again was advised to close the door and remain inside. She complied but continued to motion through the window frantically. Shortly thereafter, I approached the door to speak to her. The neighbor immediately asked me if we were looking for "Walter" who lived next door in the

5

shed/garage. I advised her that we were. She then stated that VELEZ rents the 422 LAKE

AVENUE SUBJECT PREMISES in her backyard from her landlord. The neighbor stated she

routinely sees VELEZ coming and going from the 422 LAKE AVENUE SUBJECT PREMISES

and it would not be uncommon if he were in there now. When asked about the presence of any

females being in the 422 LAKE AVENUE SUBJECT PREMISES, she stated words to the effect

of, that's a possibility but she did not know. When asked when the last time she saw VELEZ at

the 422 LAKE AVENUE SUBJECT PREMISES, she stated yesterday afternoon. She also

provided law enforcement with the name and phone number of her landlord who rents the 422

LAKE AVENUE SUBJECT PREMISES to VELEZ.

  12. The information about VELEZ potentially being in the 422 LAKE AVENUE

SUBJECT PREMISES was relayed to the tactical entry team. Once the attention turned to the

422 LAKE AVENUE SUBJECT PREMISES the entry team observed a wire running from the

416 Lake Avenue premises to a tree located outside of the 422 LAKE AVENUE SUBJECT

PREMISES and connected to a camera which was pointed at the 422 LAKE AVENUE

SUBJECT PREMISES.  A decision was quickly made to breach the locked 422 LAKE

AVENUE SUBJECT PREMISES based on exigent circumstances and officer safety.

  13. There was a large law enforcement presence at the 416 Lake Avenue premises in

which VELEZ was being called out of the 416 Lake Avenue premises by loud-speaker and

deployment of flash bangs. The fact that VELEZ was likely nearby in the 422 LAKE AVENUE

SUBJECT PREMISES and therefore likely knew he was wanted by law enforcement created a

safety risk for law enforcement as well as a heightened flight risk. Upon entry to the 422 LAKE

AVENUE SUBJECT PREMISES, VELEZ was quickly located inside along with an adult

female. VELEZ was then taken into custody without incident. While taking him into custody, the entry team observed a security camera monitor that showed live video of the 422 LAKE AVENUE SUBJECT PREMISES. Additionally, entry team personnel observed a mattress with sheets, a closet with clothes, a bucket containing what appeared to be urine, a pet rabbit, and a composting toilet. The adult female later stated she was not in any distress and denied any services, stating she would go to a local shelter.

14.     Additional follow up with the landlord who rented the 422 LAKE AVENUE SUBJECT PREMISES to VELEZ revealed that VELEZ also rents a garage space from the landlord at the 33 DUTTON STREET SUBJECT PREMISES. When asked about lease agreements for the 422 LAKE AVENUE SUBJECT PREMISES and the 33 DUTTON STREET SUBJECT PREMISES, the landlord advised there were not any written agreements and that it was all done under the table. With regards to the 33 DUTTON STREET SUBJECT PREMISES, the landlord stated that there are two garages that are connected from the outside but separated on the inside with each having its own sliding door. The landlord stated that the 33 DUTTON STREET SUBJECT PREMISES is the garage on the left if facing toward the garage doors.

15.     The 422 LAKE AVENUE SUBJECT PREMISES and the 33 DUTTON STREET SUBJECT PREMISES were subsequently secured pending this search warrant application.  An HSI special agent securing the 33 DUTTON STREET SUBJECT PREMISES spoke with a tenant who lives at the residence there and showed the tenant a picture of VELEZ.  The tenant immediately recognized VELEZ and stated that VELEZ regularly comes to the 33 DUTTON STREET SUBJECT PREMISES.

16.     As discussed in more detail in ATTACHMENT C, during the April 13, 2023 controlled buy at 416 Lake Avenue, the CD and VELEZ waited for a significant period of time at 416 Lake Avenue for runner who had gone to retrieve the fentanyl that the CD was purchasing and VELEZ made statements to the CD to the effect of it was not safe for him to keep drugs at the 416 Lake Avenue premises.

### USE OF PREMISES, ELECTRONICS IN DRUG TRAFFICKING

17.     Based upon my training and experience, as well as the collective knowledge and experience of other agents and officers in my office, I am aware of certain common practices for drug dealers.

18.     I know that drug dealers often store their drug inventory and drug-related paraphernalia, including items necessary for the manufacture of drugs in private places including their residences, places of business, or areas of curtilage around a residence or place of business as well as outbuildings such as sheds or trailers, vehicles, and in stash houses.

19.     Further, it is generally a common practice for drug dealers to maintain in the aforementioned locations records relating to their drug dealing activities and drug dealing associates. Because drug dealers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug dealers keep records to show balances due for drugs sold in the past and for payments expected as to the dealer's supplier. Additionally, drug dealers must maintain telephone and

address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug dealing business.

20.     These records may be stored physically or digitally on computer or other electronic devices or media. These records may include notes, records or ledgers of narcotics sales, debts owed, past or future shipments, and other records, including telephone record, which identify customers and/or other co-conspirators. Through my training and experience, I know that such records may be in code and/or may appear as rather innocuous and not particularly incriminating on their face. Such records are often maintained by drug dealers for extended periods of time. The aforementioned book, records, receipts, notes, ledgers, etc., are maintained where the drug dealers may have ready access to them including on electronic devices and/or stored in their residences, places of business, or areas of curtilage around a residence or place of business as well as outbuildings such as sheds or trailers, vehicles, and in stash houses. I know that it is common for drug dealers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, their businesses, outbuildings such as sheds or trailers, their vehicles, stash houses, and/or other locations which they maintain dominion and control over, for ready access and to conceal these items from law enforcement authorities.

21.     I know that drug traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. Even though these assets are in the names of others, the drug traffickers actually own and use these assets, and exercise dominion and control over them.

22.     I know that it is common for persons involved in drug dealing to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as: currency, financial instruments, precious metals and gemstones, electronics, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashiers' checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the drug dealers within their residences, businesses, outbuildings such as sheds or trailers, vehicles or other locations which they maintain dominion and control over.

23.     I know that when drug dealers amass significant proceeds from the sale of drugs, they often attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug dealers utilize, among other mechanisms, domestic and international banks and their attendant accounts, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses which generate large quantities of currency. Drug dealers often commingle narcotics proceeds with money generated by legitimate businesses.

24.     I know that drug dealers commonly maintain books or papers which reflect names, addresses and/or telephone numbers of their associates in the drug dealing/trafficking organization.

25.     I know that drug dealers take or cause to be taken photographs of themselves, their associates, and their property. I know that these dealers usually maintain these photographs in their possession. I am also aware that drug dealers store on electronic devices photos, videos, and other media associated with the sale, purchase, and distribution of illegal drugs. This media includes photographs and videos of the drugs and other items associated with their illegal

activities to demonstrate their prowess and as an advertisement of their wares. These photos, videos, and other media often establish the identities of the individuals involved in the sale, purchase, and distribution of the illegal drugs.

26.     I know that drug dealers often use or otherwise store data about importation, transportation, ordering, purchasing, shipping, and distribution of controlled substances on electronic devices. These communications and other records also tend to establish the traffickers' identities. Based on my training and experience, I am aware that drug dealers often use electronic devices to facilitate the purchase of illegal drugs. These electronic devices often contain financial data relating to the transactions, such as bank account numbers, bank records, credit card numbers, credit card account and account information used for the purchase of illegal drugs, and all identifying information for the same. The communications and other data often also demonstrate the drug dealer's state of mind.

27.     I know that drug dealers also use electronic devices for communication or other forms of data storage or sending/receiving relating to bank records, account information, and other electronic financial records ties to the importation, transportation, ordering, purchasing, and distribution of controlled substances.

28.     I know that communication through electronic devices—such as through telephone calls, texts, chat, email, instant messaging, and other applications—enables drug distributors to maintain constant contact with associates, drug suppliers, and customers. I know that it is common for drug dealers to use these applications to communicate with associates relating to the logistics of their drug trafficking business and store information (purposely or inadvertently) relating to their unlawful activities.

29.     I know that drug dealers often use cellular and/or portable telephones, smart phones, and other electronic equipment and data storage devices in furtherance of their criminal activities and to maintain contact with associates, drug suppliers and customers.

30.     I know that drug dealers who buy and/or sell controlled substances on online marketplaces often rely on one or more means of electronic communication (such as encrypted email and chat communications) as a means to facilitate this expedient communication.

31.      I know that drug dealers who often buy and/or sell controlled substances on online marketplaces often use or take payments in the form of cryptocurrency, money orders or other forms of payments.

32.     I know that drug dealers often utilize multiple vehicles in furtherance of their drug trafficking to include rental vehicles and vehicles registered in the names of third parties.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

33.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some time on the device. This information can sometimes be recovered with forensics tools.

34.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear;

rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

35.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

36.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

37.     As described in **ATTACHMENT B**, I am seeking authorization to locate not only electronically stored information that might serve as direct evidence of the crimes described in the warrant, but also forensic evidence that establishes how the devices were used, the purpose of their use, who used them, and when.

38.     Based on the facts contained in this Affidavit, and the reasonable inferences drawn from them, I submit there is probable cause to believe that this forensic electronic evidence is likely be found on the devices for the following reasons.

13

a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.   Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer

14

behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

        e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

        39.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection to determine whether it is evidence described by the warrant.

## CONCLUSION

40.     Based on the foregoing, I believe that the 422 LAKE AVENUE SUBJECT

PREMISES and the 33 DUTTON STREET SUBJECT PREMISES, which are described more

fully in ATTACHMENT A-1, and ATTACHMENT A-2, contain items described in

ATTACHMENT B that constitute evidence, fruits, or instrumentalities of drug dealing in

violation of Title 21, United States Code, Section 841(a)(1), Distribution of a Controlled

Substance.  Accordingly, I respectfully request that this Court issue a search warrant authorizing

the search of the 422 LAKE AVENUE SUBJECT PREMISES and the 33 DUTTON STREET

SUBJECT PREMISES, for the items described in ATTACHMENT B.

Respectfully submitted,

/s/Bradley Nims
Special Agent Bradley Nims
Homeland Security Investigations

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim.
P. 4.1 and affirmed under oath the content of this affidavit and application.

/s/ Andrea K. Johnstone  7/21/2023
Honorable Andrea K. Johnstone
U.S. Magistrate Judge
District of New Hampshire

16

# ATTACHMENT A-1
(Description of Property to be Searched)

1.        The 422 LAKE AVENUE SUBJECT PREMISES located at **422Lake Avenue, Manchester, New Hampshire 03103,** is a single-story garage, with off-white colored siding and white trim around the doors. The building has a light black shingled roof with a white walk-in door. The garage bay door is a multi-colored door with a lamp at the top left side of the garage door when facing it. The garage is located in the rear of the multi-family residence at 422 Lake Avenue. The 422 LAKE AVENUE SUBJECT PREMISES is depicted in the images below.

 

# ATTACHMENT A-2
### (Description of Property to be Searched)

1.      The 33 DUTTON STREET SUBJECT PREMISES located at 33 Dutton Street, Manchester, New Hampshire 03104, is a single-story garage, with two yellow wood sliding garage doors that open into two separate interior spaces. The 33 DUTTON STREET SUBJECT PREMISES is the left garage side when facing the garage doors. There is a lamp on the upper right corner of the building when facing it. The upper portion of the building is a gray metal. The 33 DUTTON STREET SUBJECT PREMISES has a left to right sliding garage door with a black handle on the left side. The 33 DUTTON STREET SUBJECT PREMISES is depicted in the image below.  There is a red arrow pointing at the left garage side rented by VELEZ.



**ATTACHMENT B**
(Description of Items to be Seized)

1.      The items to be searched for and seized are the following:

        a.   Any and all documents, records or information associated with drug trafficking, including pay-owe sheets, buyer lists, telephone lists, address books, seller lists, ledgers, records of sales, and records of expenditures made to purchase controlled substances;

        b.   Books, records, receipts, notes, and ledgers relating to the ordering, receipt, possession, transportation, purchasing, shipment, tracking, delivery and distribution of controlled substances;

        c.   Papers and records relating to names, addresses, and telephone numbers relating to co-conspirators, sources of drug supply, and drug customers.

        d.   Indicia of occupancy, residency, and ownership or use of the subject premises, including, but not limited to, utility and telephone bills, cancelled envelopes, rental, purchase or lease agreements, identification documents and keys;

        e.   Electronic devices to include but not limited to cellular telephones, computers, tablets, security cameras, and the memory thereof.  Such devices may be imaged and searched on site or elsewhere without further order of the Court;

        f.   U.S. currency, cryptocurrency, or any and all monetary instruments, or other items of value used in, or intended for use in, or derived from trafficking in controlled substances;

        g.   All of which constitute fruits, evidence and/or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (Distribution of a Controlled Substance).

19

2.      As for electronic devices belonging to or used by VELEZ, particularly cell phones, further authorization is requested to conduct a forensic examination and data extraction, at a secure location, if necessary, for the following items created and/or stored from April 10, 2023 through the present:

a.   Telephone number of the phone.

b.   Electronic serial number and any other identifying numbers that may be stored within the phone or the SIM card.

c.   Contact list, address book, calendar, schedule and date book entries.

d.   Text messages and history (incoming, outgoing, sent, draft, deleted, saved/stored on the cell phone, SIM card and/or memory card).

e.   All information retrievable from the phone regarding mobile instant messages, message alerts, text messaging applications, chat logs, emails and attachments.

f.   All locally stored voicemail messages and greeting.

g.   Photographs (including camera photos) and videos (including all formats of pictures or clips).

h.   Any information that is saved to the phone regarding any social networking sites or vendors.

i.   Any GPS data or frequently visited locations stored on the phone.

j.   Any records of call history and caller IDs.

k.   Applications installed on the phone.

l.   Files, data, or information in any form related to violations of violations of 21 U.S.C. § 841(a)(1) (Distribution of a Controlled Substance).

m. Files, data, or information in any form that may contain or otherwise constitute evidence of access, possession, control, and/or use or ownership of the cell phone.

3.      In the event the electronic devices, particularly cell phones, are "locked," further authorization is requested to compel access by using biometric features, based on the following considerations:

a.   I know from my training and experience, as well as from information found in publicly available materials including those published by Apple, that some models of Apple devices such as iPhones and iPads, offer their users the ability to unlock the device via the use of a fingerprint in lieu of a numeric or alphanumeric passcode or password.  This feature is called Touch ID.

b.   If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) at the bottom center of the front of the device.  In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered a more convenient way to unlock the device than by entering a passcode, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities, and, thus, have a heightened concern about securing the contents of the device.

c.   In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not

been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.   Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time.   Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

d.   I know from my training and experience the experience of other agents with whom I have spoken, and from information found in publicly available materials including those published by Apple, that Apple offers their users the ability to unlock the device via the use of a facial scan in lieu of a numeric or alphanumeric passcode or password.   This feature is called Face ID.

e.   If a user enables Face ID on an Apple device, he or she can register facial scans that can be used to unlock the device.   The user can then use any of the registered facial scans to unlock the device.   Users can enable Face ID to unlock a phone which operates in the manner of the user pressing a button to prompt the facial scan, and simply looking at the screen of the phone.   The iPhone employs a user-facing camera and other sensors that scans the face of the user comparing it to a scan of the face of user that is set to unlock the device.

f.   The passcode that would unlock the device is not known to law enforcement. Thus, it will likely be necessary to press the finger(s) of the user(s) of the target electronic device(s) to the device's fingerprint sensor in an attempt to unlock the device(s) for the purpose of executing the search authorized by the requested warrant.   Attempting to unlock the relevant Apple device(s) via Touch ID with the use of the fingerprints of the user(s) is necessary because

the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.  Similarly, it may be necessary to display the face of the user in front of the device in the case of Face ID.  Attempting to unlock the device through the presentation of the face of the user is necessary because the government may not otherwise be able to access the data contained on the device for the purpose of executing the requested search warrant.

g.   For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of VELEZ to the Touch ID sensor of the target electronic device(s) for the purpose of attempting to unlock the device(s) via Touch ID in order to search the contents as authorized by this warrant.

h.   For these reasons, I also request that the Court authorize law enforcement to display the face of VELEZ to the Face ID sensor of the target electronic device(s) for the purpose of attempting to unlock the device via Face ID in order to search the contents as authorized by the requested warrant.

4.      Due to the complexity and technical expertise required to properly execute search warrants for digital evidence as mentioned above, including cell phones and computers, further authorization is requested to permit civilian experts employed by the Government, to assist in the search, as needed.   These individuals have specialized training and expertise in computer forensics and will conduct their analysis under the supervision of law enforcement. Their expertise will materially assist in the execution of the warrant.

**ATTACHMENT C**

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Bradley Nims, a special agent with the United States Department of Homeland

Security, Immigration and Customs Enforcement, Homeland Security Investigations (HSI),

being duly sworn, do depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a special agent with the U.S. Department of Homeland Security,

Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), and

have been so employed since April 2018. I am currently assigned to the Manchester, New

Hampshire field office. As part of my regular duties as a special agent, I investigate criminal

violations relating to a broad range of immigration and customs-related statutes and have been

cross-designated to investigate violations relating to the distribution of illicit narcotics as

specified under Title 21 of the U.S. Code. I have been trained in drug investigations, search

warrants, surveillance, debriefing of informants, and other investigative procedures. Through my

training, education, and experience, I have become familiar generally with the manner in which

drug distribution organizations conduct their illegal activities, including purchasing,

manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the

efforts of persons involved in such activity to avoid detection by law enforcement. In addition, I

have become generally familiar with the manner in which dug distribution organizations keep

records of narcotics and monetary transactions, including through drug customer lists and other

documents relating to the manufacturing, transportation, ordering, purchasing and distribution of

controlled substances, as well as the collection, expenditure, accounting, transportation, and

laundering of drug proceeds. In the course of participating in investigations of drug distribution

organizations, I have conducted or participated in surveillance, the purchase of illegal drugs, the execution of search warrants, the use of tracking devices, debriefings of subjects, witnesses, and informants, and reviews of consensually recorded conversations and meetings.

2.       Through my training, education, and experience, I have gained an understanding of criminal drug distribution activity. I have become generally familiar with the way that drug distribution organizations conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activities to avoid detection by law enforcement. I am familiar with the various methods of operation employed by narcotics traffickers to further their illicit operations, including methods used by them to distribute, store, and transport narcotics, as well as methods used by them to collect, expend, account for, transport, and launder drug proceeds. I am also familiar with the way that narcotics traffickers use personal and rented cars and trucks, common carriers, mail and private delivery services, and a variety of other motor vehicles to: (a) meet with co-conspirators, customers, and suppliers; (b) transport, distribute, and purchase narcotics; (c) transport funds used to purchase narcotics; and (d) transport the proceeds of narcotics transactions. I have also learned that narcotics trafficking typically involves the local, interstate, and international movement of illegal drugs, to distributors and co-conspirators at multiple levels, and the movement of the proceeds of narcotics trafficking among multiple participants including suppliers, customers, distributors, and money launderers.

3.       I have consulted various sources of information to support my statements in this Affidavit. These statements are based on my participation in this investigation, as well as information I consider reliable from the following sources: my experience investigating drug

2

trafficking offenses; oral and written reports and documents about this investigation that I have received from members of other federal and local law enforcement agencies; discussions I have had personally concerning this investigation with other experienced narcotics investigators; physical surveillance conducted by law enforcement agents assisting this investigation, the results of which have been reported to me either directly or indirectly; and public records and law enforcement databases, among other sources.

4.      This Affidavit distinguishes between my direct and indirect knowledge of the matters asserted. Unless otherwise indicated, the statements contained herein are summaries of information that I have received from other law enforcement agents, and I specifically relied on oral reports and opinions from other law enforcement agents. When information is based on my personal knowledge or conclusion, it will be so stated.

5.      Since this affidavit is being submitted for the limited purpose of establishing probable cause to support the issuance of a search warrant, I have not included details about every aspect of the investigation. Observations made and conclusions drawn throughout this affidavit are based on my training and experience and include the training and experience of other law enforcement with whom I have discussed this case. While this affidavit contains material information pertinent to the requested search warrant, it does not set forth all of my knowledge about this matter.

## PURPOSE OF AFFIDAVIT

6.      I make this affidavit in support of an application for a search warrant to search the following locations:

a.   The entire premises located at 416 Lake Avenue, Manchester, New Hampshire, 03103 (the "SUBJECT PREMISES"), as more particularly described in **ATTACHMENT A-1**;

b.   The person of WALTER VELEZ ("VELEZ"), identified in **ATTACHMENT A-2**; and

c.   The electronic devices, including mobile phones, computers, and tablets, belonging to and/or primarily used by VELEZ, via forensic search and examination of content created and/or stored, from April 10, 2023, through the present, as well as other evidence, fruits, or instrumentalities of drug dealing as further described in **ATTACHMENT B**.

7.     Based on my training and experience, I submit that the fact contained in this Affidavit establish probable cause to believe that VELEZ, and others yet unknown to the Government, had committed violations of Title 21, United States Code, Sections 841(a)(1), Distribution of a Controlled Substance, and that evidence, fruits, and instrumentalities, of this offense, as well as evidence of the identity of co-conspirators will be found in the SUBJECT PREMISES, on the person of VELEZ, and within his electronic devices.

**<u>PROBABLE CAUSE</u>**

8.     Information contained in this affidavit is based upon information provided by an HSI Manchester cooperating defendant ("CD"). The CD has cooperated in this investigation beginning in April, 2023. The cooperation began after the CD was served with a Target Letter from the U.S. Attorney's Office advising the CD of the CD's pending federal drug distribution

4

charges. The CD agreed to cooperate in hopes of receiving favorable consideration with regard to those charges, which stem from five controlled narcotics purchases into the CD, totaling over 200 grams of seized fentanyl. I have reviewed the CD's criminal record. Based on that review, I have determined that the CD has multiple motor vehicle and narcotics related convictions in the State of New Hampshire, dating back to 2014. The CD is a known drug user. The CD is willing to testify.

9.      I have corroborated the information provided by the CD through surveillance, recorded conversations and meetings, and the information provided by the CD has proven to be credible throughout the CD's cooperation. Additionally, the CD's information has been corroborated by other sources of information ("SOIs"), information obtained from various public databases (such as motor vehicle and corporate records), and physical and electronic surveillance. The CD's information has never been found to be false or misleading. For these reasons, I consider the CD reliable.

10.     On April 10, 2023, HSI Manchester cultivated the aforementioned CD following the CD's state arrest on several outstanding New Hampshire bench warrants. After assisting the Hillsborough County Sheriffs Office with the arrest, HSI Manchester conducted a post arrest interview with the CD. The CD was advised of their impeding federal indictment pertaining to violations of controlled drug laws. The CD agreed to speak with HSI Manchester special agents in an effort to mitigate any potential federal charges. During this interview, the CD advised law enforcement that the CD purchases cocaine and/or crack from a subject known to the CD only as "Angelo." According to the CD, Angelo is a heavier set Hispanic male who sells cocaine and crack to the CD but the CD was aware he also sells fentanyl. Angelo runs an auto-body shop

located at the SUBJECT PREMISES. When purchasing narcotics from Angelo, the CD would physically go to the shop to make the purchase. Prior surveillance conducted by HSI Manchester had observed the CD entering the SUBJECT PREMISES and then leaving minutes later.

11.     Once the interview concluded, the CD was later bailed on personal recognizance. With the continued cooperation of the CD, two recorded phone calls were then placed to Angelo by the CD where attempts were made to order 50 grams of fentanyl and seven grams of crack cocaine. Angelo asked how much the CD was looking to pay per "stick" to which the CD advised $150 (a stick is a common term among drug dealers to reference 10 grams of fentanyl). Ultimately, Angelo said he was unable make the deal happen that day.

12.     Record checks of the New Hampshire Secretary of State website reveal a "Velez Alignment & Auto Services LLC" registered at the SUBJECT PREMISES with VELEZ listed as the registered agent. A query of the National Law Enforcement Telecommunications System ("NLETS") reveals a Walter VELEZ, Jr. living at the SUBJECT PREMISES, which is based on data from the New Hampshire DMV database. According to his New Hampshire driver's license, VELEZ is listed as 6'0" tall, 235 pounds, with black hair, and brown eyes. His date of birth is ██████████. New Hampshire DMV database records also reveal multiple vehicles registered in his name at the SUBJECT PREMISES, to include the following:

```
LIC/5281447
EXP/043024 DECAL/0795521 ISS/071223 TYP/PASS PRIOR PLATE/
VIN/1G1PK5S97B7304687 VYR/2011 VMA/CHEV VMO/CRUZE VST/4DSED
VCO/GRY WGT/4050 CYL/4 AXLES/2

LIC/5154687  STATUS/SOLD
EXP/043023 DECAL/0879580 ISS/080322 TYP/PASS PRIOR PLATE/
VIN/JTDBE30K520034709 VYR/2002 VMA/TOYT VMO/CAMRY VST/4DSED
```

6

VCO/WHI WGT/3892 CYL/4 AXLES/2

LIC/5023754
EXP/043023 DECAL/0403670 ISS/042522 TYP/PASS PRIOR PLATE/
VIN/5FNRL18024B027345 VYR/2004 VMA/HOND VMO/ODYSSEY VST/VAN
VCO/SIL WGT/5000 CYL/6 AXLES/2

LIC/7A497  STATUS/PLATE CHANGE
EXP/043023 DECAL/S017229 ISS/042522 TYP/MOTO PRIOR PLATE/
VIN/JYARJ18EX9A001119 VYR/2009 VMA/YAMA VMO/FZ6R VST/MOCLE
VCO/BLU WGT/467 CYL/4 AXLES/2

LIC/9C876
EXP/043024 DECAL/S031656 ISS/050923 TYP/MOTO PRIOR PLATE/7A552
VIN/JYARN05E5YA004124 VYR/2000 VMA/YAMA VMO/VZFR1M-
L VST/MOCLE
VCO/BLU WGT/0 CYL/4 AXLES/2

LIC/5023755
EXP/043024 DECAL/0513857 ISS/050923 TYP/PASS PRIOR PLATE/
VIN/5FCLS36B6A1001186 VYR/2010 VMA/COLB VMO/GLBL VST/NEV
VCO/WHI WGT/2700 CYL/ AXLES/2

LIC/T683387
EXP/043024 DECAL/S031657 ISS/050923 TYP/TRAI PRIOR PLATE/
VIN/NHTR0185208 VYR/2021 VMA/HMAD VMO/UTILITY VST/UTLTY
VCO/BLK WGT/700 CYL/ AXLES/1

LIC/5039614
EXP/043023 DECAL/0511028 ISS/050322 TYP/PASS PRIOR PLATE/
VIN/WBAEU33465PR15960 VYR/2005 VMA/BMW VMO/3-SERIES VST/4DSED
VCO/SIL WGT/4277 CYL/6 AXLES/2

LIC/5281400
EXP/043024 DECAL/0678352 ISS/070323 TYP/PASS PRIOR PLATE/
VIN/JHLRD1845VC045162 VYR/1997 VMA/HOND VMO/CRV SPOR VST/APURP
VCO/BLK WGT/5000 CYL/4 AXLES/2

LIC/4956814
EXP/043024 DECAL/0514550 ISS/051223 TYP/PASS PRIOR PLATE/
VIN/JHLRD1868XC044107 VYR/1999 VMA/HOND VMO/CRVEX VST/APURP
VCO/SIL WGT/4164 CYL/4 AXLES/2

7

A criminal records check of VELEZ includes a prior drug sales conviction in New Hampshire and a pending rape of a child charge in Massachusetts. As noted in more detail below, special agents later showed a picture of VELEZ's driver's license photo to the CD. The CD positively identified VELEZ as the individual she knew as "Angelo," noting that he looked slightly larger in the photo compared to now. As further noted below, VELEZ also told the CD it was his birthday while the CD was making a controlled purchase from him on April 11, 2023, which aligns with the date of birth listed on VELEZ's driver's license.

13.     On April 11, 2023, HSI Manchester facilitated a controlled buy of narcotics from VELEZ utilizing the CD. Prior to the buy, the CD was searched for any prohibited items with negative findings. Under the supervision of HSI special agents, the CD placed a recorded phone call to VELEZ to order fentanyl and crack cocaine. VELEZ advised he did not have cocaine but could do the five sticks of fentanyl at the price of $150 per stick as was discussed the previous day. With the assistance of an HSI undercover agent ("UCA"), the CD was driven to a gas station across the street from the SUBJECT PREMISES. The CD then walked across the street and entered the shop through the door directly to the left of the garage bay door. Once inside, the CD made contact with VELEZ. The CD and VELEZ conversed for some time on unrelated matter.  VELEZ advised the CD that it was his birthday today and he was turning 42.

14.     After several minutes, VELEZ provided the CD with the fentanyl and the CD provided him with $750 in HSI provided money. VELEZ advised the CD that the CD "saved his day" with that purchase and went on to speak about how city hall was forcing him to get a dumpster due to complaints about his trash from neighbors. The CD then exited the shop and walked back to the UCA vehicle where the CD then departed with the UCA.

15.     At a pre-determined location, I met the CD along with the UCA. The CD turned

over the suspected fentanyl to the UCA. The evidence contained one plastic bag with an off-

white powder. I then searched the CD for prohibited items with negative findings. The CD was

debriefed and I obtained the aforementioned account of the purchase. A review of the CD's body

worn audio recording also corroborated the CD's account of what took place. The suspected

fentanyl was weighed with a reading of 51.10 grams, which included bag weight (without the

evidence bag). The suspected fentanyl tested positive for fentanyl compound utilizing a TruNarc

handheld narcotics analyzer. It was then sent to the U.S. Customs and Border Protection

Laboratory in Chicago, Illinois, where it was formally tested by laboratory personnel and

confirmed to be fentanyl.

16.     On April 13, 2023, HSI Manchester again facilitated a controlled buy of narcotics

from VELEZ utilizing the CD. Prior to the buy, the CD was searched for any prohibited items

with negative findings. Under the supervision of HSI special agents, the CD placed an order of

five sticks of fentanyl to VELEZ through text message. VELEZ first advised he was not ready

and told the CD to wait. After some additional time passed, VELEZ advised the CD through text

message that he was ready and to come over. The UCA drove the CD to the same gas station

where the CD then walked across the street and entered the SUBJECT PREMISES through the

door immediately to the left of the garage bay door.

17.     When the CD entered, VELEZ was on the phone. According to the CD, he was

speaking to ▮▮▮▮▮▮▮▮, a suspected co-conspirator and employee of VELEZ. VELEZ

could be heard asking about where ▮▮▮▮▮ was and how much longer it would be.

Following the call, VELEZ advised the CD that it was ▮▮▮▮▮▮ who went to retrieve the

9

fentanyl. The CD and VELEZ then spoke about ███████, both complaining about how long

he always takes. VELEZ also spoke to the CD about how it is no longer safe for him to keep his

product there at the shop. He then spoke about his crack cooking methods and how long he had

been cooking for. The CD advised that there was another male also there waiting for the drug

delivery. After approximately one half-hour of waiting, I observed ███████ return to the shop

in his vehicle, park in the driveway of the SUBJECT PREMISES, and enter the shop. ███████,

█ and the CD then spoke briefly as he entered. ███████ remarked to the CD "you don't call

me no more?" The CD advised that the CD was waiting on him. ███████ and VELEZ then

met in the back garage bay area out of sight from the CD. Several minutes later, VELEZ returned

to the CD and handed the CD the fentanyl, at which time the CD handed VELEZ $750 in HSI

provided money. The CD then left the shop, returned to the UCA vehicle, and drove off with the

UCA.

  18. At a pre-determined location, I met the CD along with the UCA. The CD turned

over the suspected fentanyl to the UCA. The evidence contained one plastic bag with an off-

white powder. I searched the CD for prohibited items with negative findings. The CD was

debriefed and I obtained the aforementioned account of the purchase. A review of the CD's body

worn audio recording also corroborated the CD's account of what took place. The suspected

fentanyl was later weighed with a reading of 52.50 grams, which included bag weight (without

the evidence bag). It also tested positive for fentanyl compound utilizing a TruNarc handheld

narcotics analyzer. It was then sent to the U.S. Customs and Border Protection Laboratory in

Chicago where it is pending formal laboratory analysis.

19.     On April 19, 2023, HSI Manchester again facilitated the controlled purchase of narcotics from VELEZ utilizing the CD. Prior to the buy, the CD was searched for any prohibited items with negative findings. Under the supervision of HSI special agents, the CD placed an order of 50 grams of fentanyl and 14 grams of crack cocaine to VELEZ via a recorded phone call. VELEZ advised he needed about 20 minutes and then he would be ready. An additional call was attempted by the CD after 20 minutes but there was no answer. It was decided the CD would just go there without confirmation. The UCA then drove the CD to the same gas station where the CD then walked across the street toward the SUBJECT PREMISES.  Once the CD was in the parking lot of the SUBJECT PREMISES, the CD called VELEZ. VELEZ answered and advised the CD to go in and wait in the office. VELEZ was observed by the CD to be in the garage bay with a taller black male. There were no cars in the garage bay.

20.     After an extended waiting time, the CD observed VELEZ retrieve the drugs from a white metal cabinet in the back left of the garage bay. VELEZ then approached the CD and handed him/her the drugs, at which time the CD handed VELEZ the $1,250 in HSI provided money. VELEZ remarked to the CD that the CD saved his day today with that purchase and was "fronting" the CD an additional stick. VELEZ also made a statement that made the CD believe he was preparing for a large deal and would be well supplied in the near future. The CD then exited the SUBJECT PREMISES and walked back to the UCA vehicle where the CD then departed with the UCA.

21.     At a pre-determined location, I met the CD along with the UCA. The CD had already turned over the suspected fentanyl and crack cocaine to the UCA. The evidence contained a plastic bag containing an off-white powder as well as two additional plastic bags

11

containing several white "rocks." I then searched the CD for any prohibited items with negative findings. The CD was debriefed and I obtained the aforementioned account of the purchase. A review of the CD's body worn audio recording also corroborated the CD's account of what took place. The CD also verbally confirmed that the CD was fronted an additional stick by VELEZ.

22.     The suspected fentanyl was later weighed with a reading of 61.05 grams, which included bag weight (without the evidence bag). The crack cocaine was weighed with a reading of 16.00 grams, which included bag weight (without the evidence bag). The suspected fentanyl also later tested positive for fentanyl compound utilizing a TruNarc handheld narcotics analyzer. The crack cocaine also tested positive for cocaine using the same testing method. Both the fentanyl and crack cocaine were then sent to the U.S. Customs and Border Protection Laboratory in Chicago where it was formally tested by laboratory personnel and confirmed as fentanyl and crack cocaine, respectively.

23.     On April 20, 2023, HSI Manchester again facilitated the controlled purchase of narcotics from VELEZ utilizing the CD. At the direction of HSI special agents, the CD reached out to VELEZ via text message inquiring about purchasing 40 grams of fentanyl and seven grams of crack cocaine. The CD reported back that VELEZ could do it.  Several hours later, HSI special agents met with the CD at a predetermined location in Manchester. The CD was searched for any prohibited items with negative findings. The CD then placed a recorded phone call to VELEZ to confirm the order. VELEZ advised the CD that he could do the order and that the CD could come over. HSI special agents provided the CD with the required amount of U.S. currency, which included enough to cover the fronted stick from the prior purchase.

24.     The UCA drove the CD to the same gas station where the CD then walked across the street toward the SUBJECT PREMISES. As the CD was walking over, the law enforcement cover team observed VELEZ outside in the front parking lot of the SUBJECT PREMISES speaking with an unknown adult male. As the CD approached VELEZ, the CD was instructed by VELEZ to go into the garage bay and pretend that the CD was there inquiring about the service of the CD's car since that other adult male was VELEZ's landlord. Moments later, the CD observed VELEZ retrieve the narcotics from the same white metal cabinet in the back left garage bay area that was observed on the previous buy. VELEZ set it down nearby for the CD to retrieve, at which time the CD then handed $1,000 in HSI provided money directly to VELEZ. VELEZ instructed the CD to leave the shop a different way in order to avoid being seen by the landlord. The CD then exited the shop as instructed and walked back to the UCA vehicle where the CD then departed with the UCA.

25.     At a pre-determined location, I met the CD along with the UCA. The CD had already turned over the suspected fentanyl and crack cocaine to the UCA. The evidence contained a plastic bag containing an off-white powder as well as an additional plastic bag containing several white "rocks." I then searched the CD for any prohibited items with negative findings. The CD was debriefed where I obtained the aforementioned account of the purchase. A review of the CD's body worn audio recording also corroborated the CD's account of what took place.

26.     The suspected fentanyl was later weighed with a reading of 43.00 grams, which included bag weight (without the evidence bag). The crack cocaine was weighed with a reading of 7.25 grams, which included bag weight (without the evidence bag). The suspected fentanyl

13

also later tested positive for fentanyl compound utilizing a TruNarc handheld narcotics analyzer. The crack cocaine also tested positive for cocaine using the same testing method. Both the fentanyl and crack cocaine were then sent to the U.S. Customs and Border Protection Laboratory in Chicago where they are both pending formal testing by laboratory personnel.

27.     On July 17, 2023, a Source of Information ("SOI") was debriefed by officers with the Manchester Police Department ("MPD").  MPD knows this SOI as a local prostitute and known drug user. The SOI stated that the SOI is in fear of her life from an individual known to her as both "Angelo" and Walter VELEZ. The SOI stated that VELEZ owns an auto-shop at 416 Lake Avenue in Manchester (the SUBJECT PREMISES) and stays in a unit above the shop in the rear that is accessed by a ladder.  The SOI stated that VELEZ cuts pure fentanyl there and sells purple, blue, brown, and white heroin out of the SUBJECT PREMISES.

28.     The SOI stated that VELEZ keeps the majority of the drugs in another vehicle that is registered to him or to his shop, and he parks the vehicle within close proximity to the shop. The SOI stated that VELEZ picks up a few kilos from Lawrence, MA at leas once a week.

29.     Based on my training and experience, powder drugs such as fentanyl are generally brought into the District of New Hampshire in bulk. However, such drugs are not typically consumed by users in such high purity form. Rather, such powder drugs, when ultimately consumed by the user, are at a lower purity level. High purity powder drugs are reduced in purity by the addition of dilutants such as Inositol and vitamin B12. This process is called "cutting" or "stepping on" the drug. Other equipment, such as scales, grinders, razor blades, glass panes, and mirrors, and the like are typically used in this cutting process. Once the drug has been "cut," a

14

usual practice is to repackage it in smaller quantities in heat-sealed and/or other types of plastic bags for redistribution.

30.     The SOI also knows VELEZ to carry firearms, specifically pistols. I am aware, based on my training and experience that drug dealers typically possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs.

31.     The SOI added that VELEZ owns a shipping/storage container. The SOI reported being raped by VELEZ and stated that she knew of two additional victims he routinely rapes. The SOI added that VELEZ shackles girls to the walls of his apartment and storage container to rape them. The SOI stated that he sometimes holds them for days, raping them and making videos of him doing it. The SOI stated that the SOI was just shackled by her ankle, and locked in the storage container for about two days. The SOI stated that VELEZ does "sick and twisted" acts to the girls.

32.     On July 19, 2023, law enforcement detectives with MPD were conducting surveillance on the SUBJECT PREMISES and observed VELEZ outside walking around the driveway of the SUBJECT PREMISES. They also observed VELEZ entering a large blue Conex shipping container box that is located in the driveway of the SUBJECT PREMISES.  VELEZ was observed by detectives meeting with other associates inside of this Conex box. This Conex box matches the one described by the SOI.

## USE OF PREMISES, ELECTRONICS IN DRUG TRAFFICKING

33.     Based upon my training and experience, as well as the collective knowledge and experience of other agents and officers in my office, I am aware of certain common practices for drug dealers.

34.     I know that drug dealers often store their drug inventory and drug-related paraphernalia, including items necessary for the manufacture of drugs in private places including their residences, places of business, or areas of curtilage around a residence or place of business as well as outbuildings such as sheds or trailers, vehicles, and in stash houses.

35.     Further, it is generally a common practice for drug dealers to maintain in the aforementioned locations records relating to their drug dealing activities and drug dealing associates. Because drug dealers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug dealers keep records to show balances due for drugs sold in the past and for payments expected as to the dealer's supplier. Additionally, drug dealers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug dealing business.

36.     These records may be stored physically or digitally on computer or other electronic devices or media. These records may include notes, records or ledgers of narcotics sales, debts owed, past or future shipments, and other records, including telephone record, which identify customers and/or other co-conspirators. Through my training and experience, I know that such records may be in code and/or may appear as rather innocuous and not particularly

16

incriminating on their face. Such records are often maintained by drug dealers for extended periods of time. The aforementioned book, records, receipts, notes, ledgers, etc., are maintained where the drug dealers may have ready access to them including on electronic devices and/or stored in their residences, places of business, or areas of curtilage around a residence or place of business as well as outbuildings such as sheds or trailers, vehicles, and in stash houses. I know that it is common for drug dealers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, their businesses, outbuildings such as sheds or trailers, their vehicles, stash houses, and/or other locations which they maintain dominion and control over, for ready access and to conceal these items from law enforcement authorities.

37.     I know that drug traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. Even though these assets are in the names of others, the drug traffickers actually own and use these assets, and exercise dominion and control over them.

38.     I know that it is common for persons involved in drug dealing to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as: currency, financial instruments, precious metals and gemstones, electronics, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashiers' checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the drug dealers within their residences, businesses, outbuildings such as sheds or trailers, vehicles or other locations which they maintain dominion and control over.

17

39.     I know that when drug dealers amass significant proceeds from the sale of drugs, they often attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug dealers utilize, among other mechanisms, domestic and international banks and their attendant accounts, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses which generate large quantities of currency. Drug dealers often commingle narcotics proceeds with money generated by legitimate businesses.

40.     I know that drug dealers commonly maintain books or papers which reflect names, addresses and/or telephone numbers of their associates in the drug dealing/trafficking organization.

41.     I know that drug dealers take or cause to be taken photographs of themselves, their associates, and their property. I know that these dealers usually maintain these photographs in their possession. I am also aware that drug dealers store on electronic devices photos, videos, and other media associated with the sale, purchase, and distribution of illegal drugs. This media includes photographs and videos of the drugs and other items associated with their illegal activities to demonstrate their prowess and as an advertisement of their wares. These photos, videos, and other media often establish the identities of the individuals involved in the sale, purchase, and distribution of the illegal drugs.

42.     I know that drug dealers often use or otherwise store data about importation, transportation, ordering, purchasing, shipping, and distribution of controlled substances on electronic devices. These communications and other records also tend to establish the traffickers' identities. Based on my training and experience, I am aware that drug dealers often use electronic devices to facilitate the purchase of illegal drugs. These electronic devices often contain financial

18

data relating to the transactions, such as bank account numbers, bank records, credit card numbers, credit card account and account information used for the purchase of illegal drugs, and all identifying information for the same. The communications and other data often also demonstrate the drug dealer's state of mind.

43.     I know that drug dealers also use electronic devices for communication or other forms of data storage or sending/receiving relating to bank records, account information, and other electronic financial records ties to the importation, transportation, ordering, purchasing, and distribution of controlled substances.

44.     I know that communication through electronic devices—such as through telephone calls, texts, chat, email, instant messaging, and other applications—enables drug distributors to maintain constant contact with associates, drug suppliers, and customers. I know that it is common for drug dealers to use these applications to communicate with associates relating to the logistics of their drug trafficking business and store information (purposely or inadvertently) relating to their unlawful activities.

45.     I know that drug dealers often use cellular and/or portable telephones, smart phones, and other electronic equipment and data storage devices in furtherance of their criminal activities and to maintain contact with associates, drug suppliers and customers.

46.     I know that drug dealers who buy and/or sell controlled substances on online marketplaces often rely on one or more means of electronic communication (such as encrypted email and chat communications) as a means to facilitate this expedient communication.

47.    I know that drug dealers who often buy and/or sell controlled substances on online marketplaces often use or take payments in the form of cryptocurrency, money orders or other forms of payments.

48.    I know that drug dealers often utilize multiple vehicles in furtherance of their drug trafficking to include rental vehicles and vehicles registered in the names of third parties.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

49.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some time on the device. This information can sometimes be recovered with forensics tools.

50.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

20

51.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

52.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

53.    As described in **ATTACHMENT B**, I am seeking authorization to locate not only electronically stored information that might serve as direct evidence of the crimes described in the warrant, but also forensic evidence that establishes how the devices were used, the purpose of their use, who used them, and when.

54.    Based on the facts contained in this Affidavit, and the reasonable inferences drawn from them, I submit there is probable cause to believe that this forensic electronic evidence is likely be found on the devices for the following reasons.

a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and

passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

      b.   Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

      c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

      d.   The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

55.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The

examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection to determine whether it is evidence described by the warrant.

## **CONCLUSION**

56.     Based on the foregoing, I believe that the SUBJECT PREMISES, which is described more fully in ATTACHMENT A-1, and ATTACHMENT A-2, contain items described in ATTACHMENT B that constitute evidence, fruits, or instrumentalities of drug dealing in violation of Title 21, United States Code, Section 841(a)(1), Distribution of a Controlled Substance.  Accordingly, I respectfully request that this Court issue a search warrant authorizing the search of the SUBJECT PREMISES, and the person of VELEZ, for the items described in ATTACHMENT B.

Respectfully submitted,

/s/Bradley Nims
Special Agent Bradley Nims
Homeland Security Investigations

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Honorable Andrea K. Johnstone
U.S. Magistrate Judge
District of New Hampshire
**Jul 20, 2023**